UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

LUCY M. CARLE,

                    Plaintiff,

v.                                      Case No.  5:06-cv-7-Oc-10GRJ

LINDA S. McMAHON[1], Acting Commissioner of
Social Security,

                    Defendant.

_____/

## REPORT AND RECOMMENDATION[2]

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for disability insurance benefits and Supplemental Security Income.  (Doc. 1.)  The Commissioner has answered (Doc. 8) and both parties have filed briefs outlining their respective positions.  (Docs. 13 & 14.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED.**

## I.  PROCEDURAL HISTORY

On July 17, 1999, Plaintiff filed applications for disability insurance benefits and Supplemental Security Income claiming a disability onset date of December 25, 1997.

---

[1] On January 20, 2007, Linda S. McMahon became the Acting Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Linda S. McMahon should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

(R.405, 688.)  Plaintiff's application was denied initially and upon reconsideration. (R. 390, 394, 692, 696.)  Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ"), which administrative hearing was conducted on May 14, 2001. (R. 699.). The ALJ found that Plaintiff was capable of performing her past relevant work and denied Plaintiff's applications in a decision, dated July 24, 2001. (R. 367-375.) After seeking Appeals Council review, Plaintiff appealed the hearing decision to the United States District Court for the Middle District of Florida under civil case number 5:03-cv-428-Oc-GRJ. The Court remanded the case to the Commissioner for further consideration of the evidence and a new decision. (R. 761-785.)

On remand, the ALJ conducted an additional administrative hearing on May 27, 2005 (R. 816) and issued an unfavorable decision on September 16, 2005, again finding that Plaintiff was capable of performing past relevant work and denied her applications. (R. 737-745.) Plaintiff did not file exceptions with the Appeals Council. (R. 735.) On January 10, 2006, Plaintiff filed suit in this Court seeking judicial review of the Commissioner's decision under 42 U.S.C. §§ 405(g), 1383(c)(3). (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[3] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such

---

[3] See 42 U.S.C. § 405(g).

relevant evidence as a reasonable person would accept as adequate to support the conclusion.[4]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[5] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[6] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[7]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[8]   The impairment must be severe, making Plaintiff unable to do her

---

[4] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[5] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[6] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[7] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[8] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

previous work, or any other substantial gainful activity which exists in the national economy.[9]

The ALJ must follow five steps in evaluating a claim of disability.[10]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[11] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[12] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[13] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[14] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[15]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[16] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the

---

[9] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[10] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[11] 20 C.F.R. § 404.1520(b).

[12] 20 C.F.R. § 404.1520(c).

[13] 20 C.F.R. § 404.1520(d).

[14] 20 C.F.R. § 404.1520(e).

[15] 20 C.F.R. § 404.1520(f).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

Case 5:06-cv-00007-WTH-GRJ   Document 15   Filed 02/05/07   Page 5 of 22 PageID 62

national economy.[17] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[18]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[19] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[20]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[21] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[22] Only after the Commissioner meets this burden does the burden shift back to

---

[17] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[18] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[19] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[20] Walker at 1003.

[21] Wolfe at 1077-78.

[22] See id.

the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[23]

### III. <u>SUMMARY OF THE EVIDENCE</u>

Plaintiff, was born on July 21, 1964 and was forty-one years old on the date of the ALJ's decision.  (R. 707, 739.)  Plaintiff did not complete high school, but she earned a GED credential and a certificate in word-processing from Webster College.  (R. 739.) She has past work-experience as an administrative assistant, receptionist, and restaurant cashier.  (R. 426.)  Her work as an administrative assistant and receptionist required her to walk for one hour per work day, stand for two hours per work day, sit for five hours per work day, and kneel and crouch for one hour each per work day.  (R. 427.)  Additionally, this work required her sometimes to lift up to 50 (fifty) pounds.  (*Id.*)  Plaintiff's previous work as a restaurant cashier required her to walk or stand for eight hours per work day and frequently to lift 50 (fifty) pounds.  (R. 430.)  Plaintiff alleges that she has been unable to work since December 25, 1997 due to fibromyalgia, rheumatoid arthritis, chronic cervical sprain, chronic lumbrosacral sprain, bulging discs, chronic myofascial pain syndrome and possible multiple sclerosis. (R. 410.)

In a disability report dated July 12, 1999, Plaintiff stated that she had a limited ability to work because her pain rendered her unable to sit or stand for more than a few minutes.  (R. 410.)  Plaintiff testified at the May 14, 2001 hearing that she stopped working because of the pain resulting from an injury sustained while moving boxes.  (R.

---

[23] See <u>Doughty</u> at 1278 n.2.

710.)  However, in the disability report dated July 12, 1999 Plaintiff stated that she was laid off from her job as an administrative assistant in May 1995. (R. 410.)

At the supplemental hearing Plaintiff testified that she had been working a part-time job for a business forms company, putting labels and stickers on medical folders since February 2004. (R. 821-22.) The only medication Plaintiff currently used was ibuprofen, a non-prescription pain reliever. (R. 828.) Notably, Plaintiff has not treated with a doctor since 2001 (R. 829) because she said she was unable to pay for medical care. However, Plaintiff admits that she received Medicaid for herself and her children. (R. 829.)

After reviewing the record, including Plaintiff's testimony and the medical records from several health care providers, the ALJ determined that Plaintiff suffers from the severe impairment of fibromyalgia[24] and that her mental impairment resulted in no more than mild functional limitations and was therefore not severe. (R. 739-40.)  The ALJ  went on to find that Plaintiff did not have an impairment or combination of impairments severe enough to meet or equal those listed in Appendix 1, Subpart P of Social Security Regulation number 4.  (R. 741.)

The ALJ concluded that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work and, therefore, was not prevented from performing her past relevant work as an administrative assistant, secretary, or receptionist as those jobs are generally performed in the national economy. (R. 743.)

---

[24] Fibromyalgia is a rheumatic disease characterized by dull and persistent pain, tenderness, and stiffness of (1) muscles, (2) regions where tendons are inserted into bones, and (3) nearby soft tissues.  2-F Attorneys' Dictionary of Medicine 1790.

As this appeal concerns the ALJ's consideration of Plaintiff's pain and her primary impairment of fibromyalgia, specifically her testimony and the medical opinions relating to those subjects, the Court particularly focuses on those portions of the record relating to the subjects of fibromyalgia and pain. Furthermore, although the Court previously discussed in detail the medical records and other evidence in the Court's Report and Recommendation in case no. 5:03-cv-428-Oc-GRJ,[25] the Court will repeat that evidence here in view of the fact that this case is a separate appeal of the decision of the Commissioner.

In 1994 and 1995, Plaintiff sought treatment for neck and back pain, as well as headaches, from Dr. Ken Ng, a neurologist.  (R. 138-44.)  Dr. Ng performed an electroencephalogram ("EEG"), which showed normal results, and obtained an MRI of Plaintiff's head, which was also normal.  (R. 141-43.)  Dr. Ng found that Plaintiff had no neurological deficit.  (R. 139.)  However, Dr. Wilkerson, another of Plaintiff's treating physicians, wrote a notation in February 1995 stating that Dr. Ng had diagnosed fibromyalgia, the chronologically earliest mention of fibromyalgia contained in the record. (R. 190.)[26]

Plaintiff saw Dr. Oregon Hunter of Rehabilitation Medicine Associates on January 19, 1996.  (R. 164-67.)  Dr. Hunter diagnosed a soft tissue pain syndrome consistent with

---

[25] Doc. number 24, case no 5:03-cv-428-Oc-GRJ.

[26] Plaintiff previously testified that Dr. Bookbinder was the first person to diagnose her with fibromyalgia.  (R. 40.)  Dr. Ng's records state that he referred Plaintiff to Dr. Bookbinder.  (R. 139.) Therefore, it is possible that Dr. Bookbinder, rather than Dr. Ng, is the physician who first diagnosed the fibromyalgia, but the record contains no evidence from Dr. Bookbinder to confirm this possibility.

8

fibromyalgia.  (R. 166.)  He instructed Plaintiff to avoid heavy lifting and prolonged or repetitive bending or stooping and to change positions frequently.  (*Id.*)

From 1995 to 1999, Plaintiff received frequent physical therapy treatment from Lisa George, a registered physical therapist, at Better Body Physical Therapy.  (R. 145-63, 223-99, 466-503, 554-89.)  At the physical therapy sessions, Plaintiff generally complained of pain and soreness in her neck and lower back.  (R. 466-503, 554-89.)  After the sessions, Plaintiff frequently reported that the therapy made her feel better.  (*Id.*)

Plaintiff visited the Florida Arthritis & Allergy Institute for the first time on June 20, 1996 with complaints of neck and back pain and stiffness.  (R. 172-76.)  At that time, Dr. Jacques Caldwell diagnosed fibromyalgia.  (R. 175.)  He prescribed medication and advised Plaintiff to exercise.  (*Id.*)  Plaintiff thereafter regularly sought treatment for her pain from Dr. Caldwell and his partner, Dr. Howard Offenberg.

Plaintiff was seen by Dr. Offenberg, a rheumatologist, from November 1996 to April 2000.  (R. 219-22, 528-53, 596-614, 662-66.)  Throughout this period of time, Dr. Offenberg consistently diagnosed fibromyalgia.  (*Id.*)  Despite this diagnosis, Dr. Offenberg usually noted that Plaintiff could perform all or most of the activities of daily living, but provided no elaboration on what those activities entail.  (*Id.*)  When objective laboratory tests for rheumatoid arthritis came back negative, Dr. Offenberg diagnosed possible seronegative rheumatoid arthritis.  (R. 529, 537, 541.)

In a document entitled "Fibromyalgia Residual Functional Capacity Questionnaire," Dr. Offenberg opined that Plaintiff meets the American Rheumatological criteria for fibromyalgia and that she was not a malingerer.  (R. 323-24.)  Further, he stated that patient experienced pain at all times, which would constantly interfere with her attention

and concentration.  (R. 326.)  In evaluating Plaintiff's functional limitations, Dr. Offenberg noted that Plaintiff could continuously sit for 30 (thirty) minutes at a time, continuously stand for 15 (fifteen) minutes at a time, and sit, stand, or walk for a total of about 4 hours per work day.  (R. 327.)  As to lifting ability, Dr. Offenberg stated Plaintiff could frequently lift less than 10 pounds, but could never lift 20 pounds or more.  (R. 325.)  Additionally, he decided that Plaintiff could never stoop or crouch during the work day.  (R. 328.)

In a deposition taken on March 12, 1998, Dr. Offenberg opined that, at that time, Plaintiff appeared to be incapable of working, but noted that he based this opinion largely on Plaintiff's subjective symptoms.  (R. 332.)  He also testified that fibromyalgia has a psychological component, specifically feelings of fatigue and difficulty concentrating.  (R. 334.)

Plaintiff also received treatment from Dr. Harry Jones, an orthopaedic surgeon, from September 1997 to April 2000.  (R. 521-27, 615-23.)  On initial examination of the Plaintiff, Dr. Jones observed tenderness and limited range of motion in the cervical and lumbar spine.  (R. 526-27.)  In the upper extremities, he found no evidence of muscle weakness, sensory change, or atrophy.  (R. 526.)  In the lower extremities, Dr. Jones noted some sensory deficit in the L5 root pattern but no objective evidence of weakness. (*Id.*)  Dr. Jones diagnosed chronic cervical strain, lumbosacral sprain with left sciatica, and fibromyalgia.  (*Id.*)

On October 6, 1997, Dr. Jones reviewed MRI films taken in 1994 and 1995, which revealed bulging discs at C3-C4, C4-C5, L3-L4, L4-L5, and L5-S1 but showed no herniated discs.  (R. 525.)  In a report completed on May 22, 1998, Dr. Jones stated that Plaintiff was unable to work for approximately three months due to her illness.  (R. 523.)

Plaintiff continued to complain to Dr. Jones of neck and back pain and weakness. (R. 521, 615-23.)  Throughout his treatment of Plaintiff, Dr. Jones continued to assess fibromyalgia, but objective findings were lacking.  (R. 615-18.)  On September 17, 1998, Dr. Jones reviewed additional MRI studies of Plaintiff's cervical spine, which were negative, and MRI studies of the lumber spine, which were also negative except for mildly bulging discs at L4-L5 and L3-L4.  (R. 522.)  On May 6, 1999, Dr. Jones noted that Plaintiff's pain and weakness were not consistent with any specific "dermatomal" pattern. (R. 621.)  For treatment Dr. Jones regularly prescribed a variety of medications, including Daypro (anti-inflammatory), Soma (muscle relaxant), Prozac (antidepressant), Lorcet Plus (pain reliever), Axid (antihistamine), Imitrex (treats migraine headaches), Norco (pain reliever), Vioxx (anti-inflammatory, pain reliever), Fioricet (relieves tension headache), and Maxalt (treats migraine headaches).  (R. 521, 615.)

In a deposition taken on July 14, 1998, Dr. Jones offered the opinion that Plaintiff's impairment meets impairment 1.05C of the listing of impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 346-47.)  Additionally, Dr. Jones testified that Plaintiff could not sit for long periods, could not stand, could not lift over 10 (ten) pounds frequently, and could not lift over 15 (fifteen) pounds occasionally.  (R. 347.)

On January 3, 2000, Dr. Mario Medero consultatively examined Plaintiff on her complaints of arm, shoulder, neck, and back pain.  (R. 590-93.)  Examination revealed no abnormalities of the spine or joints, except for decreased range of motion in the shoulders and spine.  (R. 593.)  Dr. Medero noted no evidence of deformity, redness, heat swelling, pain, tenderness, or other signs of joint inflammation.  (*Id.*)  The spine's motor, sensory,

and reflex findings were normal.  (*Id.*)  Dr. Medero found no reproducible fatigue on

repetitive muscle testing.  (*Id.*)

On January 4, 2000, Allen Hodges, Ph.D., conducted a psychological consultative

examination of Plaintiff.  (R.594-95.)  Plaintiff informed Dr. Hodges that she was

depressed and described herself as a "workaholic."  (R. 594.)  Dr. Hodges observed that

Plaintiff had normal speech and thinking and was totally oriented as to time, place, and

person.  (*Id.*)  Plaintiff's mood was a mixture of anxiety, depression, and anger, but her

affect was normal in range and appropriateness.  (*Id.*)  Dr. Hodges diagnosed pain

disorder associated with psychological and general medical factors, dysthymic disorder,[27]

and ruled out a diagnosis of obsessive-compulsive personality disorder.  (R. 595.)  Dr.

Hodges concluded that Plaintiff's prognosis for returning to her previous work was poor.

(*Id.*)

Plaintiff received treatment for her back and neck pain from Dr. Charles Grudem in

2000 and 2001.  (R. 667-87.)  Dr. Grudem treated Plaintiff with medication for pain and

depression, which he found seemed to help and allowed Plaintiff to function.  (R. 678.)

On May 11, 2001, Dr. Grudem completed a form entitled "Clinical Assessment of Pain" on

which he stated that Plaintiff had repeatedly reported experiencing pain and that a person

with Plaintiff's diagnosis would be expected to experience pain.  (R. 658.)  He also opined

that Plaintiff's pain was continuous and that she suffered from a chronic pain syndrome.

(R. 659.)  Dr. Grudem noted that Plaintiff suffered from depression related to her pain and

---

[27] Dysthymic disorder is a disorder of the mood, less severe than a major depression, marked by a loss of interest in activities previously enjoyed, described by the patient as a feeling of being in the dumps, and lasting more than two years.  2-D Attorneys' Dictionary of Medicine 5402.

would be expected to experience mild side effects from her medications.  (R. 660.)  Dr.

Grudem also noted that Plaintiff exhibited "significant amplied pain behavior and non-

organic pain signs as well." (R. 687.)

On May 10, 2000, Dr. Bancks, a non-examining state agency physician, performed

a physical residual functional capacity assessment of Plaintiff.  (R. 624-31.)  Dr. Bancks

opined that Plaintiff could lift 20 (twenty) pounds occasionally and 10 (ten) pounds

frequently.  (R. 625.)  Additionally, he found that Plaintiff could stand and walk for about 6

hours per work day, and she could sit for about 6 hours per work day.  (*Id.*)  Dr. Bancks

noted that Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, or crawl.

(R.626.)  The only other exertional or non-exertional limitation noted by Dr. Bancks was

the need to avoid concentrated exposure to hazards.  (R. 628.)

Dr. Wise, another non-examining state agency physician, competed a psychiatric

review technique form on May 8, 2000.  (R. 632-40.)  He found that Plaintiff had an

affective disorder,[28] in the form of her dysthymic disorder.  (R. 635.)  Additionally, he

noted that Plaintiff had a somatoform disorder[29] related to her pain.  Dr. Wise opined that

Plaintiff had a slight restriction in activities of daily living, had a slight difficulty in

maintaining social functioning, seldom experienced deficiencies of concentration,

persistence, or pace, and never experienced episodes of deterioration or

---

[28] An affective disorder is any severe mental disorder marked by periods of extreme depression or elation.  1-A <u>Attorneys' Dictionary of Medicine</u> 3429.

[29] A somatoform disorder is a condition marked by the presence of symptoms suggesting a physical disease but without physical changes or physiological mechanisms that might account for the symptoms.  5-S <u>Attorneys' Dictionary of Medicine</u> 4400.

decompensation. (R. 639,) Dr. Wise concluded Plaintiff did not suffer from a severe

mental impairment. (R. 632.)

## IV. **DISCUSSION**

Plaintiff argues that the ALJ erred by again failing "to give proper consideration and

discuss the weight given to all of Carle's treating physicians opinions" and that "ALJ

Snavely failed to give Dr. Grudem's opinions great weight." Plaintiff argues that the ALJ

was required to specify what weight was given to the treating physician's opinion and the

failure to do so was reversible error.

In response, the Commissioner argues that the ALJ "identified several persuasive

subjective criteria for rejecting Plaintiff's assertion of debilitating pain related to

fibromyalgia." The Commissioner argues that despite Plaintiff's allegations of disabling

pain and other symptoms, "the record contained no evidence of Plaintiff seeking medical

treatment after 2001, a period of almost 4 years" and that the "unexplained inconsistency

between Plaintiff's characterization of the severity of her condition and the treatment she

sought to alleviate that condition, is highly probative of the claimant's credibility."

Furthermore, the Commissioner argues that the ALJ also correctly considered that

Plaintiff's daily activities indicated that her symptoms "were not as severe as alleged."

This case was remanded by the Court in order for the ALJ to: (1) consider the

opinions of Plaintiff's treating physicians and properly weigh the opinions in accordance

with the law of the Eleventh Circuit; and (2) evaluate the subjective testimony of the

Plaintiff and articulate an adequate credibility finding that is supported by substantial

evidence.

14

While Plaintiff's primary argument relates to the alleged failure of the ALJ to give appropriate weight to the opinions of three doctors, Plaintiff also suggests that the ALJ failed to make a pain analysis based upon the correct legal standards. Accordingly, the Court will first address the ALJ's pain analysis and then his analysis of the opinions of Plaintiff's treating physicians.

Addressing first the issue of Plaintiff's subjective complaints of pain, it is well settled that the ALJ must consider all of a claimant's impairments, including her subjective symptoms, such as pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[30]  The Eleventh Circuit has set forth a three-part test for determining when a disability may be established based on subjective complaints of pain.[31]  The "pain standard" requires that the plaintiff first produce medical or other evidence of an underlying medical condition. Then the plaintiff must demonstrate either that objective medical evidence confirms the severity of the alleged pain arising from that condition or that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.[32]  "Pain alone can be disabling, even when its existence is unsupported

---

[30] 20 C.F.R. § 404.1528.

[31] Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986).

[32] Id.

by objective evidence."[33]  However, a claimant's subjective complaints of pain do not

conclusively establish a disability unless accompanied by medical evidence.[34]

    If an ALJ decides not to credit a claimant's testimony about subjective complaints,

the ALJ must articulate specific and adequate reasons for doing so, or the record must be

obvious as to the credibility finding.[35]  A reviewing court will not disturb a clearly

articulated credibility finding with substantial supporting evidence in the record.[36]

    A lack of a sufficiently explicit credibility finding becomes a ground for remand

when credibility is critical to the outcome of the case.[37]  If proof of disability is based on

subjective evidence and a credibility determination is, therefore, critical to the decision,

"the ALJ must either explicitly discredit such testimony or the implication must be so clear

as to amount to a specific credibility finding."[38]

---

[33] Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[34] 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms *shall not alone be conclusive evidence of disability* as defined in this section; there *must* be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability") (emphasis added).

[35] Foote, 67 F.3d at 1561-62; Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[36] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[37] Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

[38] Foote, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (holding that although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

In the instant case, the ALJ applied the Eleventh Circuit's pain standard "threshold"[39] assessment to Plaintiff's subjective complaints by noting Plaintiff's "history of treatment for back and neck pain since 1994."  (R. 740.)  Although the ALJ did not cite the exact language of the standard, the ALJ's discussion and findings evidence that the standard was applied and followed by the ALJ in considering Plaintiff's subjective complaints of pain.

The ALJ stated that he "must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. § 404.1529 and 416.929, and Social Security Ruling 96-7p."  (R. 15.)  This language, a paraphrase of the pain standard, along with the supporting findings, shows that the ALJ applied the pain standard.  Moreover, the ALJ cited 20 C.F.R. §§ 404.1529 and 416.929, which contain the same language regarding subjective testimony that the Eleventh Circuit interpreted when initially establishing the pain standard.[40]

In applying the pain standard, the ALJ found that Plaintiff met the initial burden of showing an underlying medical condition, fibromyalgia. (R. 744.)  Once Plaintiff met this initial burden, however, the ALJ found Plaintiff's complaints regarding disabling pain were not "fully persuasive because they are inconsistent with her activities of daily living and lack of ongoing treatment."[41]

---

[39] Marbury, 957 F.2d at 839.

[40] See Wilson,  284 F.3d at 1226.

[41] R. 742.

Specifically, in rejecting Plaintiff's subjective complaints of pain, the ALJ relied upon the fact that since 2001 the only medication that Plaintiff has taken to deal with the pain is Ibuprofen, an over-the-counter medication. In evaluating pain the ALJ is, of course, permitted to consider a claimant's failure to seek treatment for a period of time as a factor. [42] The ALJ also discounted Plaintiff's explanation of financial inability - for not taking other medication and for not seeking further medical treatment - because the explanation was directly inconsistent with Plaintiff's own admission that she has Medicaid coverage. Moreover, the ALJ explained that despite the fact that Plaintiff has not sought any further treatment to deal with her pain, she alleges that her symptoms have remained the same.

Additionally, the ALJ articulated in detail how the Plaintiff's activities of daily living are inconsistent with her complaints of pain. In particular the ALJ explained that the Plaintiff has maintained her home, raising her children as a single mother and has continued with a relationship with a "significant other" during a portion of the period at issue. Moreover, the Plaintiff gave birth to a son three years after her alleged date of onset. Lastly, the ALJ properly highlighted that since February 2004, the Plaintiff has been able to maintain part-time work as a contract employee for a business forms company.

All of these reasons articulated by the ALJ are based upon substantial evidence which fully supports the ALJ's conclusion that the level of pain and symptoms reported by Plaintiff were inconsistent with the evidence of record. Accordingly, the Court concludes

---

[42] See, Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003); Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984).

18

that the ALJ applied the correct legal standards and articulated more than adequate reasons for rejecting the Plaintiff's subjective complaints of pain.

Turning now to the primary issue raised by Plaintiff, Plaintiff argues that the ALJ erred by failing to consider and properly weigh the opinions of three of Plaintiff's treating physicians, Dr. Offenberg, Dr. Jones and Dr. Grudem. However, contrary to Plaintiff's assertion, the ALJ clearly articulated his findings regarding each doctor and clearly expressed the weight accorded to each opinion.

For example, with regard to Dr. Grudem, the ALJ expressly stated that "[g]reatest weight is accorded to Dr. Grudem's opinion because it is the most consistent with the record as a whole, and his is the most concurrent with the period at issue." Dr. Grudem provided a report called a "Clinical Assessment of Pain Form,"[43] in which he responded to a series of questions concerning the alleged pain experienced by Plaintiff. Although, Dr. Grudem checked "extreme" on the form this notation was in response to the question "Subjectively, how much pain is this patient reporting to you? Notably, however, Dr. Grudem did not rate the level of Plaintiff's pain in response to the question "Based on your medical assessment of both the patient's subjective reporting and your objective findings, how would you rate the patient's pain? The ALJ found this inconsistency and material omission to be significant specifically noting that while Dr. Grudem "indicated that the claimant had repeatedly reported pain to him that the claimant classified as 'extreme,' Dr. Grudem chose not to select any category of pain set out by the attorney based on his medical assessment." The ALJ further explained that instead of classifying Plaintiff's pain

---

[43] R. 658.

as extreme (or rating it in any manner) Dr. Grudem stated that "there is significant amplified pain behavior and non-organic pain signs as well."[44] Accordingly, the ALJ not only addressed Dr. Grudem's opinion and the weight he accorded it, he articulated the particular reason the opinion did not support Plaintiff's claim that her pain was disabling.

Similarly, with regard to Dr. Offenberg, the ALJ expressly stated the weight accorded Dr. Offenberg's opinions and the reasons for doing so. While Dr. Offenberg testified at a deposition that Plaintiff was incapable of working the ALJ expressly stated in his decision that he did not consider Dr. Offenberg's opinion to be persuasive "because he [Dr. Offenberg] relied primarily on the claimant's self-reports which... are exaggerated."[45]  The ALJ properly noted that Plaintiff's self reports were exaggerated as evidenced by exaggerated reports previously given by the Plaintiff to a counselor[46] and by exaggerated information given by Plaintiff to another doctor regarding blood tests for rheumatoid arthritis.[47]

With regard to the opinions of Dr. Jones, Dr. Jones testified at a deposition that the Plaintiff met the criteria of listing 1.05C, which addresses "Disorders of the Spine." The ALJ expressly articulated his reason for not following this opinion. The ALJ stated that Dr. Jones' own testimony that the "claimant had no muscular weakness and only slight loss of motion of the spine," was directly inconsistent with the specific criteria in the listing.

---

[44] Id.

[45] Id.

[46] Plaintiff boasted to a counselor in August-September 1996 that Plaintiff had a "broken back," which had not been properly diagnosed due to the malpractice of a physician. R. 511.

[47] Dr. Jones testified that Plaintiff was positive for rheumatoid arthritis based on self reports by Plaintiff of the results of blood tests by Dr. Offenberg.( R. 349-50.) However, contrary to what Plaintiff told Dr. Jones, Dr. Offenberg testified that blood tests did not show rheumatoid arthritis. (R. 332, 529.)

Further, the ALJ went on to address Dr. Jones' opinions of Plaintiff's limitations discussed at his deposition. The ALJ explained that he did not consider Dr. Jones' opinions to be persuasive because the opinions were incorrectly based "on the presumption that the claimant had nerve root irritation, and all laboratory studies, including subsequent repeated magnetic resonance imaging (MRI) scans have documented the lack of any compression or irritation of nerve-roots."

Lastly, while the Plaintiff does not mention the opinions from other doctors, the ALJ also found that the assessments of Plaintiff by Dr. Bancks and Dr. Holden were not relied upon heavily because the assessments  "are somewhat overly optimistic."  Based upon his review and analysis of all of the reports from the treating doctors, the ALJ clearly articulated that he was "[t]hus compromising from the extremes of the assessments..." The ALJ then concluded that after "considering the claimant's activities of daily living and medical regimen, I am persuaded that she can perform non-strenuous work-related activities on a regular and continuing basis because it is consistent with her typical, albeit sedentary, lifestyle."[48]

Although an ALJ generally must accord considerable weight to the opinions of treating physicians this does not mean that the ALJ is bound to rely blindly on every statement offered by a doctor. Where the opinions of treating doctors are not supported by the medical evidence and the evidence supports a contrary finding, the ALJ is authorized to accord the opinions of treating physicians less weight and it is not reversible error where, as here, the ALJ articulates adequate and specific reasons for doing so that

---

[48] R. 743.

are supported by substantial evidence in the record. The ALJ has more than adequately done so in this case and, accordingly, the Court concludes that the ALJ did not err with regard to his consideration of the opinions of Plaintiff's treating physicians.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED.**

**IN CHAMBERS** in Ocala, Florida, on February 5, 2007.

GARY R. JONES
United States Magistrate Judge

Copies to:
    The Honorable Wm. Terrell Hodges
    Senior United States District Judge

    Counsel of Record